*in the matter of the*
# ARBITRATION
*between*

**INTERNATIONAL BROTHERHOOD OF**
  **ELECTRICAL WORKERS,  AFL-CIO**
  Local Union 611 (Union)

and

**PUBLIC SERVICE COMPANY**
  **OF NEW MEXICO (Company)**

FMCS Arbitration No. 18-02066
Kenny Nunn Termination Grievance

**OPINION AND AWARD**
**OF**
**JOHN C. FLETCHER, ARBITRATOR**

**November 1, 2018**

This matter came to be heard in the State Bar Center, Albuquerque, New Mexico, on August 23-24, 2018.  The Union and the herein Grievant, Journeyman Meterman Kenny Nunn, were represented by:

> James A. Montalbano, Esq.
> Youtz  & Valdez. P.C.
> 900 Gold Avenue, S.W.
> Albuquerque, New Mexico  87102

The Company was represented by:

> Robert C. Conklin, Esq.
> John K. Ziegler, Esq.
> Conklin, Woodcock & Ziegler, P.C.
> 120 Gold Avenue, S.W.
> Albuquerque, New Mexico 87102

> and

> R. Janelle, Haught, Esq.
> PNM in-house Counsel

**EXHIBIT D**

Following the closing of the hearing the parties filed post-hearing briefs with the Arbitrator on October 10, 2018, at which time the record was closed.

**Background:**

The herein Grievant, Kenny Nunn ("Grievant" or "Nunn") entered into service with the Public Service Company of New Mexico ("Company" or "Employer") on January 31, 1977, in an entry-level job. At the time of the incident giving rise to the discipline under review in this arbitration, Nunn was working as a Journeyman Meterman, having progressed to that level through various apprenticeship programs and after an extended time working in the shop had recently been assigned to pair-up with Journeyman Meterman Art Montano[1] ("Mantano"). On Friday, October 29, 2010, Nunn and Mantano were told that their Monday, November 1, 2010, assignment would be reading meters in the Farmington, New Mexico area. Departing Albuquerque at five a.m. on the 1st, in Montano's truck, Nunn took some of his gear but did not take all of his Personal Protective Equipment ("PPE"), i.e., rubber gloves and flash face shield, with him. In route to Farmington, Nunn and Montano read meters at a number of locations, without incident. On arrival at the San Juan generating plant, Nunn and Montano commenced reading meters for the Phoenix Cement facility – one reading the East

---

[1] The Union's brief refers to Nunn's work partner on November 1, 2010, as Art "Montoya". The Employer's brief and the Company's exhibits name the partner as "Montano".

side meters and the other reading the West side meters   One, a 440 volt meter, that Montano was attempting to read did not have an electronic display, and could not be read. Montano removed the cover from the meter and attempted to power it up with a jumper cable (Montano had removed from his truck) connected to a 110-volt power source.[2]  The cable, called a "widow maker"[3] has a standard 110-volt male plug on one end and alligator clips on the other that may be connected to meter terminal test strips for energizing the display.  Still unable to get a reading, Montano returned to his truck to secure a second jumper cable with the intent of powering all three phases of the meter.  While Montano was out of the building, Nunn reached into the meter with his bare hand to remove the alligator clips, and in doing so caused an arc that resulted in first-degree burns to his hand.  The injury was treated with ice at the site and the assignment completed before Nunn went to a hospital for treatment.  Montano reported the incident shortly after it occurred to his supervisor.

Two days after the incident the Company conducted its initial investigation into the incident, at which a Union Steward represented Nunn.[4]  On November 15,

---

[2]      In its brief the Employer writes "Grievant and a coworker removed the cover to the meter … ." Contemporaneous notes made on November 3, 2010, state that it was Montano who removed the meter cover.
[3]      "Widow makers" were a ubiquitous commonly used "homemade tool" in November 2010, but since have been prohibited by the Company.
[4]      Initially the investigation was conducted with both Nunn and Montano present. Later the Steward representing Montano asked that he be excused and that the two Journeymen investigations be conducted separately, which occurred.  If Montano's involvement was further investigated, that information is not a part of this record.

3

2010, Nunn and Montano were interviewed a second time. On November 30, 2010, Nunn was terminated.[5] On December 1, 2010 the instant grievance was filed asserting that the Company terminated Nunn without just cause. The grievance noted that the parties agreed to waive Step 1.[6]

On December 2 and 16. 2010, the Union filed information requests seeking, *inter alia,* a list of unit and non-unit employees who had been disciplined for safety rule/policy violations. The Company refused to furnish the information on non-unit employees because they "were not similarly situated to Nunn."[7] The Union filed a complaint with the NLRB. On June 22, 2012, ALJ Eleanor Laws found in its favor. The Company filed exceptions and the Board issued its Decision and Order on March 27, 2014, affirming Judge Laws ruling.[8] The Company petitioned for review of the Board's decision. On December 20, 2016, the D.C. Circuit rejected that petition.[9]

It was not until August 28, 2017, that, according to the material in this record, the Company made a response to Nunn's grievance. There it was written:

> Mr. Nunn violated portions of the Employee Safety Manual, on November 1, 2010, he did not participate in or initiate a documented tailboard prior to beginning the job and failed to wear

---

[5] The Company states in its brief that, "Mr. Montano was also discharged." (p.24.) That is all the information available in this record on Montano and the status of his situation.
[6] Company Exhibit No. 1.
[7] *Public Service Co. of N.M. and IBEW Local No. 611, 360* NLRB No. 45. 573. p. 600.
[8] Ibid.
[9] *See, Public Service Company of New Mexico v. NLRB, 843* F.3d 999.

4

rubber gloves while working on energized equipment and when he removed auxiliary power from a 480- volt meter while alone. Additionally, he did not wear the arc flash face shield in accordance with management's expectations.[10]

In due course the Information Requests of the Union were answered and the material requested was provided.[11]

On November 30, 2017, Nunn's grievance was the subject of an arbitration request filed with the FMCS[12] and in due course the undersigned was appointed as the Arbitrator and a hearing was held on the merits on August 23/24, 2018, at which no procedural or jurisdictional impediments to a final and binding award were raised.

## THE ISSUE

The Union asks that the Issue in this matter be stated as:

> Did the employer have just cause to terminate the employment of Kenny Nunn, and if not, what is the proper remedy?

The Company asks that the Issue be stated as:

> Whether reasonable cause existed to discharge the Grievant.
> If not. What is the appropriate remedy?

Because the parties agreement[13] provides that the Company may "discharge employees for reasonable cause"[14] this matter will be decided on the basis of the Employer's statement of the issue, even though it can be debated that at the end of

---

[10] Company Exhibit No. 2.
[11] *See for example;* Union Exhibit No. 9, and attachments.
[12] FMCS Arbitration No. 181130-02066
[13] Joint Exhibit No.1.
[14] ibid. Article 7. p. 9.

FMCS No. 18-02066
IBEW & PNM
Kenny Nunn Termination

the day, in light of the seminal decision of Arbitrator Daugherty in *Enterprise Wire*,[15] little difference exists between discipline for "just cause" and discipline for "reasonable cause".  In either application ***employment at will is absen*** t and disciplinary actions need to meet the standards articulated in the seven tests and its progeny, or it is subject to modification or revocation.[16]

## THE POSITION OF THE PARTIES

**The Position of the Employer:**

The Company asserts that Nunn "disregarded and ignored" several fundamental and mandatory safety rules when he was assigned to read a high voltage meter at one of its power plants.  It first notes that he went to the job that day without a complete complement of personal protective equipment.  Next he proceeded to commence work without first doing a "tailboard"[17] to determine how the job would be completed and the risks involved.  He then proceeded to work on an energized meter without testing to ensure that it was not energized.  In the process Nunn and Montano continued to work on the meter without holding a

---

[15] *Enterprise Wire Co.,* 46 LA 259 (1966)
[16] *See,* Brand, *Discipline and Discharge in Arbitration,* BNA Books, "Just cause is the underlying equitable principle to which arbitrators determine whether the discipline or discharge of an employee should be upheld." (Preface p. xii)
   *See also,* St. Antoine, *The Common Law of the Work Place, The Views of Arbitrators,* BNA Books,  "As used in this chapter, the term 'discipline' means any punishment up to including discharge.  Terms like 'cause.' 'good cause.' 'proper cause.' 'sufficient cause,' and so on are unless otherwise agreed, synonyms for just cause." (p.169.)
[17] "Tailboards" are job briefings occurring before the work commences designed to identify hazards and control unsafe work practices.   The Company asserts that tailboards are required in all circumstances and that they need to be documented in writing.

6

second tailboard to assess changed circumstances. Nunn ignored posted warning signs, and reached into an energized meter without a flash shield and he was not wearing rubber gloves, at a time when his work partner was out of the area – all actions in disregard of and in violation of safety rules, safety rules that a journeyman meterman was most certainly aware of, safety rules that Nunn had received specific training on.

Discipline of discharge for these offenses is appropriate, especially since Nunn was at the time serving discipline of a nine-month written reminder for a "work place scuffle" with another employee.

**The Position of the Union:**

The Union first notes that Nunn had never been disciplined for a safety violation in the past, and that he had in fact been awarded certificates for safe work practices. And, as to the fact that he was under discipline at the time of his injury, the Union notes that it resulted from an argument with another employee and that it had nearly expired at the time. Here, the Company did not follow progressive discipline and others involved in more serious safety violations have not been terminated.

The Union notes that it was not Nunn who hooked up the widow maker, and that even while injured finished the job before seeking treatment. Widow makers, incidentally, were in common use at the time.

7

As to the tailboard aspect of the charge, the Union notes that it was not rare for tailboards to be skipped and that written tailboards did not come into common practice and enforcement until several years after the accident. The tailboard process itself was a work in progress. And, no one has ever been terminated for failure to do a tailboard, the Union says. Moreover, a lead employee should conduct tailboards, and neither Nunn nor Montano, equally ranked journeymen meter readers, were designated as a lead that day or upgraded to the status of working foreman.

Finally, the Union argues disparate treatment, arguing that other Company employees have not been terminated after being involved in serious safety infractions.

## DISCUSSION

For starters, notwithstanding that the Company in its brief repeatedly conjunctively joined Nunn and Montano in alleged particular unsafe work activity, i.e., "Grievant and a co-worker removed the cover to the meter,"[18] "Grievant and Montano probed one meter,"[19] etc., notes taken by Company personnel on November 3, 2010 and November 15, 2010,[20] fairly reviewed, force the conclusion that it was Montano who initially assumed that the meter was de-energized because it lacked a display, it was Montano who went to his truck to get a widow

---

[18] Company Brief, p.4.
[19] ibid, p.8.
[20] Company Exhibits 8, 9, and 10.

8

maker,[21] it was Montano who removed the meter cover, and it was Montano who attached the widow maker to the meter.  ***Nunn's pre-injury involvement, it is manifestly apparent from these notes, was a single attempt to remove the alligator clips from the meter***.

At the hearing and in its brief, the Company devoted considerable time and writing to the "tailboard violation."  The Union has argued that at the time, tailboards were a work in progress.  In the Company's notes taken on the November 15, 2010, Fact Finding Interview with Montano it is written: "No tailboard <u>ever</u> for reading meters.  Just read the meters."[22]  When this contemporaneous writing is considered with testimony that tailboards were a work in progress, sometimes done orally or not at all, that someone in charge should be responsible for initiating a tailboard (and neither Montano or Nunn was given that responsibility)[23] and that no one has ever been disciplined for failure to hold a tailboard, it must be concluded that it was inappropriate to discipline Nunn (who was neither a lead employee, foreman, or supervisor at the time) for an alleged tailboard violation.[24]

---

21    *See,* Company Brief, p. 8, where it is stated, "**they** (emphases added) went out to the truck and got a jumper cord and an extension cord."  The Arbitrator is unable to conclude that Nunn accompanied Montano to his truck on this visit or any of the trips Montano made, even though the Company's brief suggests that Nunn did so.
22    Company Exhibit 10 b. – Double underlining in the original.
23    Company Exhibit No. 17 is a blank Tailboard Safety Plan form.
24    In this regard see Union Exhibit No. 6, a September 6, 2012 Memo to Company employees, entitled Safety Improvement Actions, that in paragraphs 3 and 4 mentions improving tailboards and training of supervisors "on how to conduct tailboards and safe

FMCS No. 18-02066<br>
IBEW & PNM<br>
Kenny Nunn Termination

With that said, however, there is no question that Nunn engaged in an unsafe work practice when he reached into an energized meter with his bare hand to remove an alligator clip connected to an extension cord. For this act, discipline is not inappropriate, *and may indeed be required for corrective purposes*. What level of discipline is appropriate in the circumstances existing here, though, is the question? The Company argues that because Nunn was already at Written "Reminder, 9 months", it was appropriate to progress to "Termination." The Union argues, and submits testimony and evidence of other employee safety violations that did not result in termination.

There is in place in this record a copy of the Company's Positive Discipline Policy. The opening paragraph of that policy states:

> To assure fairness and equality in the treatment of disciplinary matters, the Company uses the Positive Discipline System. All employees, with the exceptions listed below, are subject to the Positive Discipline process. Supervisors are responsible for following the process outlined below.
>
> The Positive Discipline Process consists of the following steps:
>
> 1. Coaching Session
> 2. Oral Reminder
> 3. Written Reminder

---

work assessment". The structure of these two paragraphs seems to indicate that supervisors needed additional training on holding tailboards. At the time neither Montano nor Nunn were in any type of supervisor capacity - just working journeymen assigned to read meters. In noting the above the Arbitrator acknowledges he has considered Footnote 1 to the Company's brief. But, even so, the Memo does support the notion that Tailboards were a work in progress, as asserted by the Union and sometimes were not held, held orally, and were not always documented.

    4.  Decision making leave

  These steps will generally be taken in the order listed, although some steps may be omitted when serious offenses have been committed.[25]

While the foregoing indicate that there are four steps to the Discipline Process, attached to Exhibit 7 is a chart indicating the presence of a fifth step, "Termination".[26] In this matter the Company bypassed "Decision Making Leave" in administrating Nunn's discipline and moved directly to termination.[27] The Company argues that this was appropriate because the policy allows that "steps may be omitted when serious offenses have been committed." Nunn was already on active discipline and that he "violated multiple safety rules" it argues.

  Considering the "active discipline" matter first. The Union argues that the discipline at Step 3 involved a work place scuffle and the November 1, 2010 incident was a single accident. That notion is rejected. It makes no difference, the discipline system in place here is not a two-track system, like some attendance/misconduct systems are where infractions are tracked separately and the ensuing discipline is based on either attendance or misconduct, but not mixed

---

[25] Company Exhibit No. 7.
[26] ibid, p. 7.
[27] The Company supervisor who imposed the discipline is deceased. Accordingly, he was not available to provide testimony as to why Step 4 was bypassed. And, any testimony by others today, almost eight years after the fact, as to his reasons for bypassing Step 4, would be pure speculation, especially since the policy stresses; "**Supervisors are responsible for following the process outlined below**," (emphasis not in original) and therefore presumably it was the deceased supervisor who made the decision to skip Step 4.

with each other. With that said, however, unless a major (serious) event took place, Nunn's next step in the Positive Discipline Policy would be Step 4, "Decision Making Leave".

The Company repeatedly asserts that the injury was a serious event, and as such it was privileged to bypass Step 4 and effect Step 5 - Termination. As noted earlier, from study of the contemporaneous notes taken by Company employees at the time, the nearly singular element of misconduct that may properly be attributable to Nunn was his reaching into the energized meter with a bare hand to remove an alligator jumper clip. Nunn did not remove the cover from the meter and he did not hook up the widow maker to the meter. Therefore, it must be concluded that the Company erred when it bypassed Step 4 of its Positive Discipline Policy and moved to Step 5 and terminated Nunn on November 30, 2010. Accordingly, it is order that the termination be converted to a Step 4 Decision Making Leave with a one day paid leave for "making a decision about weather he [can] abide by Company standards,"[28] for twelve months duration, effective retroactively to December 1, 2010.

As the remedy for this violation, it is ordered that Nunn be immediately returned to employment with the Company in his former position of Journeyman Meterman with full seniority and that he be compensated for all wages and benefits lost subsequent to December 1, 2010. The only offsets the Company may

---

[28]   ibid, page 5.

take from the back pay due Nunn is earning that he made working within the state of New Mexico, as the evidence in this record is uncontroverted and conclusive that he was unable to work in his trade in that state because he had been fired by the Company.

Citing Arbitrator Kravit in *Wackenhut Corp*, 124 LA 1345,[29] the Union asks for an award of interest on the monies due Nunn. That arbitrators have the authority to award interest was initially settled in *Falstaff brewing*[30] even when the parties' agreement is silent on the matter. And, recognizing that this matter was delayed into arbitration because the Company refused to provide the Union with information it was entitled to possess, and was further delayed because the Company took exception to the decision of the ALJ, and next the decision of NLRB itself, with an ensuing unsuccessful challenge in Federal Court,[31] an observation of Arbitrator McDermott is instructive:

> The demand for payment of interest on the monies due is one that is only occasionally raised in arbitration cases, which involve damages. It is however, a demand that can only be granted under special circumstances. As an example, if it can be shown that a Company acted in a very arbitrary fashion in its handling of a case that a logical conclusion could be drawn that the Company was

---

[29] "The new norm is to award interest, rather than deny it."
[30] *Falstaff Brewing Corp v. Local No. 153, Teamsters,* 103 LRRM 2008 (D.N.J. 1978)
[31] With these comments we do not mean to suggest that because an enterprise took lawful advantage of legal action available to it and did not prevail, it had ought to be penalized. But, when such action results in inordinate delay, the case here, the injured party is entitled to relief.

deliberately trying to injure the affected employees, an arbitrator might find cause for inclusion of interest as a part of damages.[32]

Accordingly, interest is awarded on the monies to be paid Nunn, at the applicable IRS rate in place for the periods involved, compounded quarterly.

The Arbitrator will retain jurisdiction over this matter for six months to deal with any issues that may arise with respect to the remedy provided herein.

## AWARD

The grievance filed in this matter is sustained. Journeyman Meterman Kenny Nunn is to be promptly returned to employment with the Company, and placed in the Decision Making Leave step (Step 4) of the Company Positive Discipline Policy, as noted above. Nunn is also awarded back pay for wage loss and benefits, as noted above, and interest is awarded on the monies due, as noted above. The only off sets permitted are wages earned in the State of New Mexico, as noted above.

Jurisdiction is retained for six months from the date indicated below.

*[signature: John C. Fletcher]*

**JOHN C. FLETCHER, ARBITRATOR**

**November 1, 2018**

---

[32]   *American Chain & Cable Co.,* 40 LA 312 (1963)